UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| TAMMY M. DALTON, | : | Case No. 3:16-cv-57 |
| | : | |
| Plaintiff, | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| | : | |
| CAROLYN W. COLVIN, | : | |
| COMMISSIONER OF THE SOCIAL | : | |
| SECURITY ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

REPORT AND RECOMMENDATIONS[1]

I.      **Introduction**

        Plaintiff Tammy M. Dalton brings this case challenging the Social Security

Administration's denial of her application for a period of disability and Disability

Insurance Benefits.  She asserted that after working in the grocery-store business for over

seventeen years, she could no longer work a substantial paid job due to residuals of lung

cancer, including a lobectomy; chronic obstructive pulmonary disease; trigger finger of

the right thumb; depression; anxiety; and posttraumatic stress disorder.  Administrative

Law Judge (ALJ) Gregory G. Kenyon concluded that she was not eligible for benefits

because she is not under a "disability" as defined in the Social Security Act.

_____

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #12), Plaintiff's Reply (Doc. #13), the administrative record (Doc. #6), and the record as a whole.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings.  The Commissioner asks the Court to affirm ALJ Kenyon's non-disability decision.

II.    **Background**

Plaintiff asserts that she has been under a "disability" since December 25, 2012. She was fifty-one years old at that time and was therefore considered a person "closely approaching advanced age" under Social Security Regulations.  She has a high school education.

A.    **Plaintiff's Testimony**

Plaintiff testified at the hearing before ALJ Kenyon that she cannot work a fulltime job with the limitations she has.  (Doc. #6, *PageID* #142).  She explained that she wanted to go back to work at the supermarket where she had been a produce manager.  *Id.* at 127, 142-43.  She met with her boss to discuss jobs.  *Id.*  Unfortunately, they were not able to find any position in the store that Plaintiff would be able to do.  *Id.* at 142-43.

Plaintiff's lung first collapsed on December 24, 2012.  *Id.* at 145.  At the hospital, doctors put a chest tube in.  *Id.*  Less than two weeks later, her lung collapsed again.  *Id.* She underwent surgery to pin her lung to her chest wall so that it would not collapse again.  *Id.*  During surgery, her doctor found a large growth in her lung, removed part of

2

it, and sent it for a biopsy. *Id.* Two days later, they learned the growth was cancerous. *Id.* She then had a second surgery to remove a portion of her lung and eleven lymph nodes. *Id.* at 146.

She has been in constant pain since December 24, 2012. *Id.* at 127. The pain is on the right side of her body, in her lung area, under her arm, and into the area of her back. *Id.* at 128. The type of pain she experiences depends on what she is doing. *Id.* If she is standing, she develops "a very strong and a very deep stinging type pain." *Id.* On a regular basis, her pain is between seven and eight on a scale from one to ten. *Id.* She cannot do any activities that involve pulling. *Id.* at 144. Plaintiff is able to lift her right arm above her head, but it is painful. *Id.* at 129-30. Even when she is writing, she has to take a break because it increases the pain in her right arm. *Id.*

Her primary-care physician told her that her surgical incisions cut through three of her nerve roots, causing pain. *Id.* at 146. Additionally, he told her that the chance of them healing is "50/50." *Id.* She takes Percocet for the pain, and "[i]t takes the edge off." *Id.* at 129. She started using a cane at the recommendation of her physical therapist and primary-care physician. *Id.* at 135. She explained, "the farther that I walk, the weaker than I get on my right side. The pain increases and my balance is affected." *Id.* Plaintiff stated that she wants to look into alternatives to pills such as medical massage, but she cannot afford it. *Id.* at 129. She has an appointment scheduled with a pain clinic after the hearing. *Id.*

Plaintiff also has emphysema and COPD. *Id.* at 130. She explained, "I get very short of breath very easily from walking, showering, anything like that. . . . If it's colder

outside or it's damp . . . , it's difficult to breathe and it really limits the time I can be outside." *Id*. She also has difficulty with respiratory irritants like smoke, dust, and cleaning products. *Id.* at 130-31.

Plaintiff uses two inhalers: Symbicort and a rescue inhaler. *Id.* at 132. She uses Symbicort twice a day. *Id.* She also had chemotherapy and suffers from the ongoing effects. *Id.* Specifically, she has "chemo brain," explaining, "the more rounds of chemo that I took and the chemo drugs building up in my body, the more you become foggy, fussy headed, for lack of a better description." *Id.* Chemo also caused a tingling pain in her wrists, fingers, and feet. *Id.* at 133. On a scale from one to ten, she rated her pain as a three or four. *Id.*

Plaintiff has also developed anxiety and depression. *Id.* at 135. She has anxiety about providing for her son and "depression about how much [her] child has had to basically step into a caregiver role." *Id.* at 136. She has crying spells daily that average twenty to thirty minutes. *Id*. She testified that she also has difficulty concentrating and recalling things. *Id*. For example, she was an avid reader but now can only read for fifteen to twenty minutes at a time. *Id.* at 137. She also has "anxiety and depression just about the leisure activities and those kind of things that I used to do with my son on a daily and weekly basis." *Id.* at 138.

Plaintiff also experiences fatigue. *Id.* at 133. She takes naps four to five times per week for approximately forty-five minutes. *Id.* at 134. She usually sleeps six hours per night. *Id.* Plaintiff also has difficulty being around other people. *Id.* at 138. When people are in close proximity to her in crowded situations, she gets nervous. *Id.*

4

Plaintiff lives in a house with her eleven-year-old son. *Id.* at 125-26. She can walk down steps but walking up is difficult. *Id.* at 131. When she walks up stairs, she has to sit, rest, and catch her breath. *Id.* She also has to rest after she does minor chores such as washing dishes. *Id.* at 134. Her friend helps her and she pays someone to mow her grass, rake leaves, and shovel snow. *Id.* at 147-48. She has a driver's license and is able to drive short distances. *Id.* at 126.

During a typical day, she watches televisions, reads a little, and is trying Chinese healing exercises. *Id.* at 142. She leaves the house every day to take her son to the bus stop and pick him up. *Id.* at 138. She also can go to the grocery store and use a motorized cart. *Id.* She is not able to carry the groceries into the house. *Id.* at 139. She attempts to walk her dogs and at the time of the hearing, could walk one and one-half blocks. *Id.* She estimated that she can stand in one spot for five to ten minutes and can lift a gallon of milk. *Id.* But, it hurts her arm when she lifts anything. *Id.* She can sit for thirty-five to forty minutes at one time. *Id.* at 140. She is able to take care of her personal needs. *Id.* She can wash dishes, do laundry (when her son carries the laundry up the stairs), and do a small amount of dusting. *Id.* She was also able to do a small amount of gardening during the summer with her friend and son's help. *Id.* at 140-41. She swims in an indoor pool three times per week for an hour each time. *Id.* at 141. She uses exercises that her physical therapist suggested. *Id.* at 142. Although she still experiences pain in the water, "it's quite a bit less." *Id.* at 147.

She takes antidepressants to help her sleep. *Id.* at 136. Even with them, she wakes up two to four times per night. *Id.* at 148. Sometimes she wakes up because her arm

causes her excruciating pain.  *Id.* at 149.  She has PTSD from the eighteen days she spent in the hospital after her second surgery.  *Id.*  She also has nightmares about not being able to breathe, cancer coming back, and leaving her son.  *Id.* at 149.

### B.      Vocational Expert's Testimony

At the hearing, William Braunig, a vocational expert, testified about available jobs in the region.  *Id.* at 151-55.  The ALJ posed the following hypothetical question to Mr. Braunig:  Are there jobs available, regionally and nationally, for an individual of Plaintiff's age, education, and work experience who is capable of performing light work activity with the following restrictions:  occasional use of the upper extremities for overhead reaching; no climbing ladders, ropes or scaffolds; no exposure to hazards such as unprotected heights or dangerous machinery; no concentrated exposure to temperature extremes or respiratory irritants; limited to performing unskilled, repetitive tasks; occasional contact with coworkers and supervisors; no contact with the public; no fast-paced production work activity or jobs involving strict production quotas; and limited to performing jobs in a relatively static work environment where there is very little, if any, change in the job duties or work routine from one day to the next?  *Id.* at 152-53.  Mr. Braunig testified that there are approximately 17,700 positions regionally and 2.9 million jobs nationally.  *Id.* at 153.  Examples include clothing markers, office helpers, and mail clerks.  *Id.*  He further explained that the use of cane by that individual mainly for assistance with ambulating would not effect the number of jobs available, nor would the individual being off task twenty percent of the time.  *Id.* at153-54.  However, if the

individual had to take two additional breaks during the day, the individual would be subject to disciplinary action and subsequent termination. *Id.* at 155.

### C. Opinions

#### i. Donald Clark, M.D.

Dr. Clark, Plaintiff's primary-care physician, completed a Residual Physical Capabilities Questionnaire on April 24, 2014. *Id.* at 687-90. He noted that he treats Plaintiff for ATN, lung cancer, chest wall pain, depression, neuropathy, and COPD. *Id.* at 687. Dr. Clark opined that she can sit, stand, and walk for one hour each, and can alternate between sitting and standing for two hours. *Id.* She can never lift any weight and occasionally carry up to ten pounds. *Id.* He further opined that she could not perform sedentary or light work. *Id.* at 688. She can use her hands for simple grasping and fine manipulation but cannot use her right hand for pushing or pulling. *Id.* She can frequently reach above her shoulder with her left arm; occasionally reach above her shoulder with her left arm, bend, twist from side to side, kneel and return to a standing position, and climb stairs; and never squat and return to a standing position or climb ladders, scaffolding, etc. *Id.* She should avoid unprotected heights, working around moving machinery, exposure to marked changes in humidity or temperature, work requiring substantial outside activity in cold or rainy weather, and exposure to dust, fumes, or gases. *Id.* at 689. She is mildly restricted from driving automotive equipment. *Id.* He opined her pain and/or fatigue are consistent with clinical findings. *Id.* Additionally, her chest-wall pain, neuropathy, and COPD could reasonably be expected to produce pain and fatigue at a level that would preclude fulltime work. *Id.* Dr. Clark

7

concluded that her limitations can be expected to last for twelve continuous months or longer. *Id.*

> ### ii. Satheesh K. Kathula, M.D.

Dr. Kathula, Plaintiff's treating oncologist, completed a medical questionnaire in response to a request from the State agency. (Doc. #6, *PageID* #437-38). He diagnosed Plaintiff with Stage 1B adenocarcinoma of the lungs, [with] poorly differentiated histology [and] visceral pleura involvement." *Id.* at 438. He also indicated that Plaintiff's treatment includes chemotherapy, and the treatment side effects have been or are expected to be disabling for at least twelve months. *Id.* He noted that goal of treatment is remission, but there were not any signs yet. *Id.* He concluded that Plaintiff's prognosis is "guarded." *Id.*

> ### iii. Emily Porter, LISW

Ms. Porter completed a mental impairment questionnaire on May 1, 2014. *Id.* at 579-84. She has treated Plaintiff since July 10, 2013. *Id.* at 579. Ms. Porter diagnosed her with general anxiety disorder, adjustment disorder with mixed depression and anxiety, dysthymic disorder, and PTSD. *Id.* She identified the following as Plaintiff's signs and symptoms: poor memory; appetite disturbance with weight change; sleep disturbance; emotional lability; recurrent panic attacks; anhedonia or pervasive loss of interests; difficulty thinking or concentrating; decreased energy; manic syndrome; intrusive recollection of a traumatic experience; generalized persistent anxiety, and hostility and irritability. *Id.* Plaintiff has a history of marked anxiety and depression that has been exacerbated by her medical condition, limited mobility, shortness of breath, and

8

inability to work.  *Id*.  Ms. Porter opined that her mental impairments and symptoms are "moderate yet increased due to medical issues" and have lasted or will last at least twelve months.  *Id.* at 579-80.  Plaintiff's treatment includes bimonthly cognitive behavioral therapy (CBT) and medication.  *Id.* at 580.  The medication is effective, but her "anxiety persists."  *Id*.

Ms. Porter opined that Plaintiff's impairments or treatment would cause her to be absent from work more than three days per month.  *Id.* at 581.  Additionally, she is extremely limited in her ability to perform at a consistent pace without an unreasonable number and length of rest periods and markedly limited in her abilities to maintain regular attendance and be punctual within customary, usually strict, tolerances; complete a normal workday and workweek without interruptions from psychologically-based symptoms; and deal with normal work stress.  *Id.*  She is moderately limited in her abilities to remember work-like procedures; understand and remember very short and simple instructions; maintain attention for more than two-hour segments; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions; get along with coworkers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in a routine work setting.  *Id.*  Ms. Porter explained that Plaintiff's fatigue, shortness of breath, anxiety, and irritability make "performing daily jobs . . . difficult at this time."  *Id.*

Ms. Porter further opined that Plaintiff is moderately limited in her abilities to remember, understand, and carry out detailed instructions; set realistic goals or make plans independently; and deal with stress of semiskilled and skilled work.  *Id.* at 582.

9

She is also moderately limited in her ability to interact appropriately with the general public; travel in unfamiliar places; and use public transportation. *Id.* She has marked restrictions of activities of daily living; moderate difficulties in maintaining social functioning; frequent deficiencies of concentration, persistence, or pace resulting in a failure to complete tasks in a timely manner; and repeated episodes of decompensation. *Id.* She concluded that Plaintiff "has difficulty breathing, walking, laboring, dealing with stress[;] chronic fatigue[;] difficulty using hands [at] times[;] and may be susceptible to hazardous environmental conditions." *Id.* at 583.

### iv. Donald Kramer, Ph.D.

Dr. Kramer evaluated Plaintiff on July 5, 2013. *Id.* at 451. He noted that she walked in with a cane, and "did appear to be very unstable, slow and unsteady on her feet." *Id.* at 452. Additionally, "Although she reports that her main work limitations are physical in nature, she does report that she has been very depressed since her diagnosis of lung cancer. *Id.* at 451. Plaintiff reported "motivational problems and feelings of grief over her physical losses and limitations." *Id.* at 454. She further reported "bouts of crying every day . . . ." *Id.* at 452. Her affect was sad and depressed and she cried during the interview. *Id.* at 453. When she was eighteen years old, she was raped and almost murdered, and she has flashbacks and nightmares. *Id.* at 452. Dr. Kramer noted that she has experienced posttraumatic stress disorder (PTSD) symptoms throughout her life, but with her added stress and depression, her flashbacks and nightmares have gotten worse and she has difficulty sleeping as a result. *Id.* at 454.

10

Dr. Kramer diagnosed adjustment disorder with mixed emotional features and PTSD. *Id.* at 455. Her prognosis appears guarded. *Id.* She appears to be of average intelligence and displayed no cognitive difficulties, and her long-term memory, short-term memory, judgment, and insight are adequate. *Id.* at 454-55. She did not appear to have any thought disorders. *Id.* at 453. He noted that although her attention, concentration, persistence, and pace were adequate in the interview, she reported increased motivational problems because of her depression. *Id.* at 456. He concluded, "The claimant does come across as a women who is experiencing a high level of emotional distress. She was tearful . . . and does come across as being rather anxious, frightened, and overwhelmed by her medical diagnosis. She [reports] that her coping skills and stress tolerance are weak . . . ." *Id.* at 457. Further, "it is hard for her to deal with even minimal stressors due to her increased depression and anxiety." *Id.*

### v.     Gary Hinzman, M.D.

On April 29, 2013, Dr. Hinzman reviewed Plaintiff's records and opined that she had no severe impairments. *Id.* at 161-66. He found that lung cancer was a non-severe impairment, and she does not have a combination of impairments that is severe. *Id.* at 164. He concluded that she was not disabled, noting that her "condition is expected to improve and not last 12 months or more in duration . . . ." *Id.* at 165-66.

### vi.     Paul Tangeman, Ph.D. & William Bolz, M.D.

On August 7, 2013, Dr. Tangeman reviewed Plaintiff's record. *Id.* at 168-84. Dr. Tangeman opined that Plaintiff's severe impairments include affective disorders and anxiety disorders and that her lung cancer was a non-severe impairment. *Id.* at 177. He

11

further opined that she has moderate restrictions of activities of daily living, difficulties in

maintaining social functioning, and difficulties in maintaining concentration, persistence,

or pace, and no repeated episodes of decompensation. *Id.* at 178. She is moderately

limited in her ability to maintain attention and concentration for extended periods;

complete a normal workday and workweek without interruptions from psychologically

based symptoms and to perform at a consistent pace without an unreasonable number and

length of rest periods; interact appropriately with the general public; get along with

coworkers or peers without distracting them or exhibiting behavioral extremes; and

respond appropriately to changes in the work setting. *Id.* at 180-81. He noted that she is

"very symptomatic . . . but still able to perform some routine activities within her

physical capacity. She would do best with tasks that do not require more than short

periods of focus to complete and where she is given flexibility on breaks and shift times

during more symptomatic periods." *Id.* at 180. Additionally, "She should not work in

large public settings or handle customer complaints. She can work with small groups of

familiar coworkers where her work is separate from that of others and where she has only

casual, brief interactions. *Id.* at 181. "She can handle a set routine of predetermined

tasks where changes are occasional and minor." *Id.*

 Dr. Bolz reviewed Plaintiff's record and concluded she is not disabled, noting that

her "physical condition is expected to continue to improve and not last 12 months or

more in duration . . ." and her "mental conditions are not severe enough to keep [her]

from working." *Id.* at 183.

III.    **Standard of Review**

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1).  The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope.  It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job – i.e., "substantial gainful activity," in Social Security lexicon.  42 U.S.C. § 423(d)(1)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).  Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).  Substantial evidence consists of "more than a

13

scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry – reviewing the correctness of the ALJ's legal criteria – may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV.   **The ALJ's Decision**

As noted previously, it fell to ALJ Kenyon to evaluate the evidence connected to Plaintiff's application for benefits. He did so by considering each of the five sequential steps set forth in the Social Security regulations. *See* 20 C.F.R. § 404.1520. He reached the following main conclusions:

Step 1:     Plaintiff has not engaged in substantial gainful employment since December 25, 2012.

Step 2:     She has the severe impairments of: residuals of lung cancer, including a lobectomy; chronic obstructive pulmonary disease; trigger finger of the right thumb; depression; anxiety; and posttraumatic stress disorder.

Step 3:     She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

14

Step 4:      Her residual functional capacity, or the most she could do in a work setting despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "light work . . . subject to the following limitations:  (1) occasional overhead reaching; (2) no climbing of ladders, ropes, and scaffolds; (3) no concentrated exposure to temperature extremes or respiratory irritants[;] (4) frequent use of the right upper extremity for handling and fingering; (5) limited to performing unskilled, simple, repetitive tasks; (6) occasional contact with co-workers and supervisors; (7) no public contact; (8) no fast-paced production work or jobs involving strict production quotas; and (9) limited to performing jobs in a relatively static work environment in which there is very little, if any, change in the job duties or the work routine from one day to the next."

Step 4:      She is unable to perform any of her past relevant work.

Step 5:      She could perform a significant number of jobs that exist in the national economy.

(Doc. #6, *PageID* #s 104-14).  These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability.  *Id.* at 114.

## V.    <u>Discussion</u>

Plaintiff contends that the ALJ failed to follow the Regulations in evaluating and weighing the medical opinion evidence and erred in finding that Plaintiff was not credible.  Further, Plaintiff asserts that the ALJ failed to adequately account for her moderate limitation in concentration, persistence, or pace in the hypothetical to the vocational expert.  The Commissioner maintains that the ALJ did not err in evaluating the treating source opinion evidence of record, did not err in his evaluation of Plaintiff's credibility, and adequately accounted for Plaintiff's moderate limitation in concentration, persistence, or pace in his hypothetical question to the vocational expert.

15

### A.    Medical Opinions

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions.  "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule."  *Rogers,* 486 F.3d at 242 (citations omitted).  The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors."  *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions.  *Wilson*, 378 F.3d at 544.  This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions."  *Id.* (quoting Soc. Sec. Rul. No. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).  The goal is to make clear to

16

any subsequent reviewer the weight given and the reasons for that weight.  *Id*.

Substantial evidence must support the reasons provided by the ALJ.  *Id*.

<u>*Dr. Clark*</u>

ALJ Kenyon found that "the conclusion of Dr. Clark that [Plaintiff] is

disabled/unemployable cannot be given controlling, or even deferential weight."  (Doc.

#6, *PageID* #110).  In the ALJ's explanation for the weight he assigned, he refers to both

conditions of the treating physician rule.  First, he concludes Dr. Clark's opinion is not

supported by the record.  He included some rationale, noting that she "made an excellent

recovery from her lung cancer," and "There is no reason why she would be limited to

standing, walking, and sitting for combined total of just three hours per day and from

lifting any weight whatsoever."  *Id.*  The ALJ also asserts, "Dr. Clark seems to have

simply accepted [Plaintiff's] subjective allegations and complaints as fact without any

inquiry into whether they are supported by the record."  Second, the ALJ contends that

Dr. Clark's opinion is inconsistent with other medical evidence of record.  *Id.*

Neither of the ALJ's findings are supported by substantial evidence in the record.

Dr. Clark's opinion is supported by the treatment notes and opinions from other providers

and his own treatment notes.  For example, Dr. Razi's treatment notes detail Plaintiff's

struggle after the removal of forty percent of her lung.  In July 2013, Dr. Razi noted that

Plaintiff has "some dyspnea with heat and humidity. . . . [and] will wheeze and have chest

tightness with heat."  *Id.* at 645.  Additionally, upon listening to her lungs, he indicated

that she had diminished breath sounds.  *Id.* at 647.  He opined that Plaintiff had a lot of

anxiety which may be contributing to her symptoms.  *Id.*  In December 2013, Dr. Razi

17

noted that Plaintiff reported increased dyspnea in the past two weeks and that she was using a cane.  *Id.* at 652-53.  And, more than one year after her surgery, in March 2014, Dr. Razi's notes indicate that she experiences more dyspnea with cold air, occasionally wheezes, and still has operative-site pain and uses a cane for support.  *Id.* at 654.

Dr. Nanda, Plaintiff's oncologist, noted, "The patient is tearful as she was released from her job as she unable to perform her duties anymore."  *Id.* at 620.  And, Dr. Kramer, the State agency psychologist, noted that Plaintiff "walked with the assistance of a cane … and did appear to be very unstable, slow, and unsteady on her feet."  *Id.* at 452.

Dr. Clark's opinion is also supported by CT scans of Plaintiff's chest.  In January 2014, a CT scan of Plaintiff's chest revealed diffuse severe emphysema.  *Id.* at 609.  The scan also showed multiple nodules in Plaintiff's lungs.  *Id.*  Although the nodules appeared to be stable in size and number, the doctor who reviewed the scan, Dr. Nielson, noted, "Attention to this finding on short-term followup imaging is suggested."  *Id.*

Finally, Dr. Clark's own notes support his opinion.  For example, on August 7, 2014, Dr. Clark noted that Plaintiff reported fatigue, dyspnea/shortness of breath, chest pain, headaches, depression, and anxiety.  *Id.* at 764.  Additionally, she cannot walk across a parking lot without shortness of breath.  *Id.*  He prescribed Percocet for pain but it does not help very much and only "takes the edge off."  *Id.*  He then prescribed gabapentin for pain, but she cannot take it during the week because it "knocks her out" and she is unable to wake up to take her son to school.  *Id.*  On September 22, 2014, Dr. Clark noted that she reported the same issues, and in the physical exam section, he noted,

"[r]espiratory effort:  no dyspnea and good air movement; pain upon deep inspiration." *Id.* at 761.

Substantial evidence does not support the ALJ's conclusion that Plaintiff made an excellent recovery from her lung cancer.  There are certainly some positive reports of Plaintiff's recovery.  For example, Dr. Razi noted in April 2013, "She seems to be doing relatively well."  *Id.* at 399.  But, no physician opined that her recovery had been excellent, and several report complications.  A month after her surgery, Dr. Kathula noted that she "is still recovering, but slowly, from surgery."  *Id.* at 439.  In September 2013, Dr. Nanda noted, "She, unfortunately, continues to have postthoracotomy pain as well as dyspnea on exertion."  *Id.* at 614.

Turning to the second condition of the treating physician rule, the ALJ summarily concluded that Dr. Clark's opinion is inconsistent with the evidence of record.  But, he did not identify a single piece of evidence that is inconsistent with Dr. Clark's opinion. Even if Dr. Clark's opinion is not entitled to controlling weight under the treating physician rule, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 . . . ."  Soc. Sec. R. No. 96-2P, 1996 WL 374188, at *4.

The ALJ did not weigh Dr. Clark's opinion under any of the factors.  When an ALJ fails to provide good reasons, the Sixth Circuit has made clear: "We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not *comprehensively* set forth the weight assigned to a

treating physician's opinion." *Hensley v. Astrue,* 573 F.3d 263, 267 (6th Cir. 2009) (emphasis added) (citation and footnote omitted).  The ALJ's findings concerning the treating physician's rule are not supported by substantial evidence and do not amount to "good reasons" for rejecting Dr. Clark's opinion.

### *Dr. Kathula*

On June 12, 2013, Dr. Kathula, Plaintiff's treating oncologist, completed a medical questionnaire.  (Doc. #6, *PageID* #437-38).  In it, he provided Plaintiff's diagnosis—"Stage 1B adenocarcinoma of the lungs, [with] poorly differentiated histology [and] visceral pleura involvement." *Id.* at 438.  Dr. Kathula also indicated that Plaintiff's treatment includes chemotherapy and the treatment side effects have been or are expected to be disabling for at least twelve months. *Id.*  He notes that goal of treatment is remission, but there were not any signs yet. *Id.*  He concludes that Plaintiff's prognosis is "guarded." *Id.*

The ALJ acknowledges that Dr. Kathula is Plaintiff's treating oncologist but does not weigh his opinion. *Id.* at 107.  The Commissioner contends that the ALJ was not required to weigh Dr. Kathula's opinion because his assessment is not a medical opinion as defined by the Regulations.  (Doc. #12, *PageID* #910) (citing 20 C.F.R. § 404.1527(a)(2).

The Commissioner's assertion lacks merit.  Under the Regulations, "Medical opinions are statements from physicians . . . that reflect judgments about the nature and severity of [a person's] impairment(s), including [his/her] symptoms, diagnosis and prognosis, what [he/she] can do despite impairment(s), and [his/her] physical or mental

20

restrictions." 20 C.F.R. § 404.1527(a)(2). Several of Dr. Kathula's responses certainly fall under that definition. Most notably, he provides both her diagnosis and prognosis. He also clearly indicates that the side effects from chemotherapy have been or are disabling for twelve months. Although that statement may be an opinion on an issue reserved to the Commissioner, it is an opinion.[2]

"[A]n ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley*, 581 F.3d at 407 (emphasis in original) (quoting *Rogers,* 486 F.3d at 243). Not only did the ALJ fail to provide good reasons, he completely failed to weigh, or even acknowledge, Dr. Kathula's opinion.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[3]

### B.    Remand

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to

---

[2] "[T]reating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance." Soc. Sec. Rul. No. 96-5p, 1996 WL 374183, at *3 (Soc. Sec. Admin. July 2, 1996). However, the ALJ must still weigh the opinion under the factors in 20 C.F.R. § 404.1527(d). *Id.*

[3] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's challenge to the ALJ's assessment of her credibility and the hypothetical question posed to the vocational expert is unwarranted.

provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47 (6th Cir. 2004); failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Humans Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of §405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to

determine anew whether Plaintiff was under a disability and whether her application for

Disability Insurance Benefits should be granted.

## IT IS THEREFORE RECOMMENDED THAT:

1.    The Commissioner's non-disability finding be vacated;

2.    No finding be made as to whether Plaintiff Tammy M. Dalton was under a "disability" within the meaning of the Social Security Act;

3.    This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Report and Recommendations, and any decision adopting this Report and Recommendations; and

4.    The case be terminated on the Court's docket.


Date: January 24, 2017                          *s/Sharon L. Ovington*
                                                Sharon L. Ovington
                                                United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).